UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RALPH JERVIS, JR., RONALD
M. MARSHALL, SR., ALLEN W.
NELSON, III, RICHARD MARTIN,
JOHN T. WALDRON, and JOHN T.
WITTAKER,
      Plaintiffs,

    v.              C.A. No. 12-478 ML

UNITED ASSOCIATION OF PLUMBERS AND
PIPEFITTERS LOCAL UNION NO. 51 PENSION FUND,
Through its Trustees, ROBERT BOLTON, DAVID RAMPONE,
MICHAEL ST. MARTIN, DAVID GREENBERG, TIMOTHY
BYRNE, JOHN MCMULLEN, PAUL ALVAREZ, ANTHONY
VACCHELLI,

      Defendants,
and

JAMES A. O'SHEA,
      Plaintiff,

    v.              C.A. No. 12-482 ML

UNITED ASSOCIATION OF PLUMBERS AND
PIPEFITTERS LOCAL UNION NO. 51 PENSION FUND,
Through its Trustees, ROBERT BOLTON, DAVID RAMPONE,
MICHAEL ST. MARTIN, DAVID GREENBERG, TIMOTHY
BYRNE, JOHN MCMULLEN, PAUL ALVAREZ, ANTHONY
VACCHELLI,
      Defendants.

DECISION AND ORDER

I.  Introduction

  These cases are brought by retired members of a local union.  In 1998 and 1999, the

Trustees of the United Association of Plumbers and Pipefitters Local Union No. 51 Pension Fund

1

determined that Plaintiffs were eligible to retire and to receive benefits under the pension plan.

Plaintiffs retired and each began receiving a monthly pension benefit.  Plaintiffs received their

monthly benefits uninterrupted for approximately 14 years.  In April 2012, however, Defendants,

the current Trustees of the pension fund, informed Plaintiffs that, because Plaintiffs did not meet

the eligibility requirements for the monthly pension benefit that they were receiving, their

benefits would be reduced substantially.[1]

The April 2012 pronouncement by Defendants did not sit well with Plaintiffs. Plaintiffs

filed suit.  The complaints include claims for pension benefits pursuant to § 502(a)(1)(B) of the

Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., ("ERISA"), claims for

breach of fiduciary duty and estoppel, claims under § 502(a)(3)(A) of ERISA for an injunction

restraining Defendants from reducing Plaintiffs' benefits, and claims pursuant to 29 U.S.C. §

1024 for failure to supply requested information.  The Court consolidated the cases and

conducted a three-day bench trial.[2]  The parties have now submitted post-trial memoranda and

the matter is ripe for decision.  The Court's findings of fact and conclusions of law are set forth

below.

---

[1]Ralph Jervis, Jr. was receiving $2,917 per month; he was informed that his benefit would be reduced to $1,142 per month.  Richard Martin was receiving $2,487 per month; he was informed that his benefit would be reduced to $1,813 per month.  John Waldron was receiving $2,407 per month; he was informed that his benefit would be reduced to $1,730 per month.  James O'Shea was receiving $2,388 per month; he was informed that his benefit would be reduced to $945 per month.  John Whittaker was receiving $1,725.36 per month; he was informed that his benefit would be reduced to $1,293 per month.  Defendants later determined that Ronald M. Marshall, Sr. ("Marshall"), and Allen W. Nelson, III ("Nelson"), satisfied the eligibility requirements.  Thus, Marshall's and Nelson's claims are moot.

[2]In June 2012, Defendants agreed to the entry of a temporary restraining order restraining Defendants from reducing Plaintiffs' benefits.  The parties agreed to extend the temporary restraining order pending this Court's decision on the merits of Plaintiffs' claims.

## II.  Background

### A.  The Merger

On January 1, 1997, four local labor unions: the Plumbers Union Local 28 ("Local 28"),

the Plumbers & Pipefitters UA Local 77 ("Local 77"), UA Local 276 Plumbers & Pipefitters

("Local 276"), and the Steamfitters & Apprentices Local Union 476 ("Local 476"), merged,

thereby creating the Plumbers and Pipefitters Local Union No. 51 ("Local 51").  Prior to the

merger, each Plaintiff was a member of one of the merging unions.  All Plaintiffs became

members of Local 51 on January 1, 1997.

The Local 51 Pension Fund ("Pension Fund") was created on September 1, 1997,

pursuant to an agreement and declaration of trust by and between Local 51 and the New England

Mechanical Contractors Association.  The agreement gives the Trustees of the Local 51 Pension

Fund ("Trustees") the authority to adopt a pension plan.  On September 1, 1998, the Local 28

Pension and Retirement Plan, the Local 77 Pension Fund, the Local 276 Pension Plan, and the

Local 476 Pension Plan merged into the Local 51 Pension Fund.

The Local 51 pension plan document was not formally adopted by the Trustees until

October 12, 1999.  By its terms, however, it was made effective September 1, 1998.  A summary

plan description ("SPD") of the pension plan was forwarded to Plaintiffs in September 1999.

### B.  Plaintiffs Retiring Before The Formal Plan Document Was Adopted

#### 1.  Ralph Jervis, Jr.

Ralph Jervis, Jr. ("Jervis") was a member of Local 28 for 35 years.  When Jervis began

contemplating retirement he spoke to Fran McKeown ("McKeown"), at the time, the Local 51

Pension Fund administrator.  McKeown told Jervis "basically what the plan was paying out

3

under the new [Local 51] plan . . . ."  April 9, 2013 Transcript at 46.  On or about September 10, 1998, Jervis submitted a Local 51 "Application for Retirement Benefits and Request for Benefit Amounts" ("application for retirement").

At the time Jervis submitted his application for retirement, the Segal Company ("Segal") was the Local 51 pension plan actuary.  Charles Austin ("Austin") was a consulting actuary with Segal.  In a letter dated June 7, 1999, Austin informed McKeown that Jervis "did not earn credit after the merger date (September 1, 1998)."  Exhibit P.  On or about July 9, 1999, however, Jervis received a fax transmission from McKeown forwarding Jervis a copy of a letter from Austin.  The letter informed Jervis that Austin had calculated his retirement benefit and that Jervis could choose from one of six benefit payment options.  On or about July 9, 1999, Jervis executed a Local 51 "Election of Payment Option Form" ("election form") and selected a monthly benefit of $2,805.60.  The effective date of Jervis' retirement was October 1, 1998.[3] The Trustees met on October 20, 1998, and "made note of the first Local 51 retirees.  They [were] Richard Martin, Ronald Marshall, and Ralph Jervis."  Exhibit F.

On or about April 27, 2012, approximately 14 years after he retired, Jervis received a letter ("April 2012 letter") from Defendants.  The letter informed Jervis that

> the amount of Pension Benefit Payments which you have received (and are receiving) from the Local #51 Pension Plan was unsupported by the Local #51 Pension Plan Document and thus has been in error.  That is . . . the payment amount you have been receiving has been over-stated and thus in excess of the payment amount supported by the Plan Document.
>
> Specifically, in accordance with Article II (entitled "Participation"), Section 2.02 .

---

[3]Jervis testified that the ten-month delay between his application for retirement benefits and his benefit election was as a result of the time he spent researching hours that he worked for Local 28.  Records from local 28 were destroyed and he had to request information from the Social Security Administration.

> . . of the Local #51 Pension Plan Document, subsequent to the 1998 Pension Plan
> Merger [September 1, 1998] Members/Employees were required to work at least
> 120 Hours of Service in Covered Employment under the Local #51 Pension Plan .
> . . in order to be considered a Participant under the Local #51 Pension Plan. . . .
> Therefore, the pension benefits of any pre-merger Pension Plan Participant who
> failed to work at least 120 hours of Service in Covered Employment under the
> Local #51 Pension Plan Document must be calculated in accordance with the
> pension benefit provisions from [the] pre-merger pension plan document, and not
> in accordance with the pension benefit provisions from the Local #51 Pension
> Plan Document.

Exhibit 32 at 1 (emphasis in original).[4]  The letter informed Jervis that an audit had indicated that

he had not worked 120 hours in covered employment under the Local 51 pension plan

subsequent to the date of merger, September 1, 1998 ("120-hour requirement").  The letter also

advised that if Jervis had any evidence that he had met the 120-hour requirement he should

forward it to Local 51.  If he did not have any such evidence, Defendants informed Jervis that his

pension benefit would be reduced according to the provisions of the pre-merger Local 28 pension

plan.  Defendants notified Jervis that his pension benefit would be reduced by $1,775 per month.

### 2.  Richard Martin

Richard Martin ("Martin") was a pipefitter and a member of Local 476 for 33 years.

Martin began contemplating retirement in 1998.  In the summer of 1998, Kenneth Aurecchia

("Aurecchia"), at the time a Trustee, informed Martin that he would be better off waiting to retire

until after September 1, 1998, because Martin's pension would be higher under the Local 51

pension plan.  In planning for retirement, Martin attended union meetings where union officers

discussed the consolidation of the four unions and its impact on the Local 51 pension plan.

Based upon information he received at the union meetings and from colleagues, Martin

---

[4]All Plaintiffs received a version of the April 27, 2012, letter.  All Plaintiffs also testified that they were not
notified of the 120-hour requirement before they retired.

performed his own calculation of the benefit he believed that he was entitled to under the Local 51 plan.

On or about September 1, 1998, Martin submitted a Local 51 application for retirement. On or about September 30, 1998, Local 51 forwarded Martin a copy of a letter from Austin informing Martin that Austin had calculated his retirement benefit and that Martin could choose from one of six benefit payment options.  Martin's personal calculation of his benefit approximated the benefit that Austin had calculated.   On or about October 5, 1998, Martin executed a Local 51 election form and selected a monthly benefit of $2,392.03.  The effective date of Martin's retirement was September 1, 1998.  Because Defendants determined that Martin did not meet the 120-hour requirement, Defendants notified Martin that his pension benefit would be reduced by $674 per month.

### 3.  John Waldron

John Waldron ("Waldron") was a steam fitter and a member of Local 476 for 37 years.  In or about August 1998 Waldron spoke to Aurecchia about retirement.  Aurecchia informed Waldron that he had "the hours in and the time" and suggested that Waldron obtain an application for retirement.  April 9, 2013 Transcript at 86.  On or about September 14, 1998, Waldron submitted a Local 51 application for retirement.  On or about September 30, 1998, Local 51 forwarded Waldron a letter from Austin informing Waldron that Austin had calculated his retirement benefit and that Waldron could choose from one of six benefit payment options.  On or about October 8, 1998, Waldron executed a Local 51 pension plan election form and selected a monthly benefit of $2,315.10.  The effective date of Waldron's retirement was September 1, 1998.  Because Defendants determined that Waldron did not meet the 120-hour

requirement, Defendants notified Waldron that his pension benefit would be reduced by $677 per month.

### 4.  James O'Shea

James O'Shea ("O'Shea") began his career as a pipefitter with Local 476 in 1969. O'Shea began contemplating retirement in 1998.  On or about September 30, 1998, William Turner ("Turner"), at the time the business manager of Local 51 and a Trustee, forwarded O'Shea a copy of a letter from Austin.  The letter informed O'Shea that Austin had calculated his retirement benefit and that O'Shea could choose from one of six benefit payment options.  On or about October 9, 1998, O'Shea executed a Local 51 election form and selected a monthly retirement benefit of $2,296.97.  The effective date of O'Shea's retirement was October 1, 1998. Because Defendants determined that O'Shea did not meet the 120-hour requirement, Defendants notified O'Shea that his pension benefit would be reduced by $1,443 per month.

### C.  Plaintiff Retiring After The Formal Plan Document Was Adopted

### 1.  John Whittaker

John Whittaker ("Whittaker") was a pipefitter and a member of Local 476 for 27 years. On or about November 3, 1999, Whittaker submitted a Local 51 application for retirement.  On or about December 2, 1999, McKeown forwarded Whittaker a copy of a letter from Austin informing Whittaker that Austin had calculated his retirement benefit and that Whittaker could choose from one of six benefit payment options.  Whittaker selected a monthly retirement benefit of $1,507.10.  Whittaker testified that he retired on December 1, 1999.  The parties, however, stipulated that the effective date of Whittaker's retirement was January 1, 1999.  Because Defendants determined that Whittaker did not meet the 120-hour requirement, Defendants

notified Whittaker that his pension benefit would be reduced by $432 per month.[5]

### D.  The Actuary

The Court initially heard this matter over a two-day period.  During the process of reviewing the documentary evidence however, the Court uncovered a significant gap that required further inquiry.  The Court reopened the evidence to elicit testimony from Austin, the actuary who performed Plaintiffs' benefit calculations.

Austin testified that, in addition to performing benefit calculations, he was also involved in drafting the initial Local 51 pension plan document.  Austin stated that before the plan document was drafted, Segal presented an outline of the pension plan to the Trustees.  The outline included a schedule of plan benefits that Segal believed the Pension Fund could afford.  The Trustees approved Segal's outline and directed Segal to draft a plan document.  At or about the time Plaintiffs retired, it was Austin's practice to attend Trustee meetings from "time to time. . . ."  June 25, 2013 Transcript at 43.

Several months after the merger of the unions, Segal presented the first draft of the plan document to the Trustees.  Austin testified that Linda Frailing ("Frailing"), a Segal employee, had the responsibility for producing drafts of the pension plan document and when

> she had questions along the way, I would answer her or I would . . . call the fund office to find out what the answer was or should be.  And then when . . . she was finished with her draft I would review it; and, when ready, it would be sent to the fund office for presentation to counsel.

Id. at 15.  Although Austin testified that it was more than likely that there was more than one

---

[5]All Plaintiffs testified that they made significant financial decisions based upon the amount of the monthly retirement benefit that they were receiving from the Local 51 pension plan.  Because the Court does not reach the estoppel claims of the Plaintiffs who retired before the formal pension plan document was adopted, however, the Court need not take this testimony into account in reaching its decision.

draft of the pension plan document, he did not know how many drafts were reviewed by the Trustees before the pension plan document was adopted in October 1999. Austin testified, however, that from August 31, 1998, to October 1999, the Local 51 pension plan document was "essentially a work in progress." Id. at 37. As late as July 26, 1999, the minutes of the Trustees' meeting reflect that the SPD and plan document were discussed and plan counsel and Austin were "working on changes that needed to be made." Exhibit 34 at 1.

Austin stated that, even though there was no specific plan "in effect" in 1998, the Trustees "were comfortable enough" with the results of Segal's calculations that the Trustees decided to allow the payment of benefits based on (1) the Segal outline, (2) information from the Pension Fund office, and (3) the benefit calculations "as presented to [the Trustees] for review." Id. at 28. When performing benefit calculations, it was Austin's practice to utilize the draft plan document "in effect" at the time of the calculation so long as it was his understanding that the draft plan reflected the wishes of the Trustees. Id. at 19. Austin, however, could not identify the draft plan document he used in calculating Plaintiffs' benefits. Austin stated that he would forward his benefit calculations to Turner and Turner would review them and forward them to the Trustees for their review and approval. Austin testified that eligibility determinations, benefit calculations, and benefit payments were all approved by the Trustees.[6]

The Trustees met on August 4, 1998, for the purpose of reviewing "the new pension plan document . . . ." Exhibit E at 1. The minutes reflect that several changes to the document were discussed. On or about August 31, 1998, Frayling forwarded a memorandum to plan counsel. In

---

[6]Austin explained that if there was a lengthy time period between Trustee meetings, one Trustee from the labor side and one Trustee from the management side would review the benefit calculations and act on the retirement request subject to the full Board of Trustees ratification at a later date.

addition to the memorandum, Fralying also forwarded counsel a "redlined copy of the plan document, showing all changes since the original draft." Exhibit N (emphasis added). The memorandum stated that in

> addition to the changes in your memo and those we discussed by phone, I made the following changes after discussion with [Austin]: . . . [I] [a]dded a statement that a Participant must have earned 1/10 Pension Credit under the Plan after September 1, 1998 to be eligible for a pension under the Plan's terms . . . .

Id. Austin explained that the proposed 1/10 Pension Credit provision would have required a participant to have worked at least 120 hours after September 1, 1998. There were several other changes noted in the memorandum and Frayling informed legal counsel that she "look[ed] forward to discussing the draft . . . ." Id.

The August 31, 1998, red-line copy of the draft pension plan document included the provision that a "Participant must have earned at least 1/10 Pension Credit under the Plan based on Hours of Service on or after September 1, 1998 to be eligible for a pension under the terms of this Plan." Exhibit O at § 3.01. Austin testified, however, that the August 31, 1998, red-lined copy of the pension plan document would have had to have been approved by plan counsel and confirmed as the "wish of the [T]rustees" before he used that document to calculate a benefit. June 25, 2013 Transcript at 22. Austin, however, was not aware if the Trustees reviewed the 1/10 Pension Credit provision. The 1/10 Pension Credit provision is *not* in the formal plan document adopted by the Trustees in October 1999. See Exhibit 10.

Austin testified that he did not apply the 1/10 Pension Credit provision in calculating Plaintiffs' benefits. Although he could not specifically remember performing Plaintiffs' benefit calculations, Austin testified that, at the time, he would have performed Plaintiffs' benefit

calculations based on his best understanding of the Trustees' wishes, information he received from the Pension Fund office, and the draft document "in effect" at the time of the calculation. Austin's benefit calculations would then have been presented to the Trustees "for their review and ultimate decision." June 25, 2013 Transcript at 44.

Austin testified that it would have been his practice, had he known about the 120-hour requirement at the time he performed a benefit calculation, to make a notation on the benefit calculation for the Trustees to review. Austin stated that he "would have at least discussed [the 120-hour requirement] with the fund manager if [Segal was] presenting the wishes of the [T]rustees." June 25, 2103 Transcript at 23. With respect to the June 7, 1999, letter wherein Austin informed McKeown that Jervis did not earn credit after September 1, 1998, Austin testified that he was merely "poin[ting] out that [Jervis] earned no credit after the merger date. The application [of the 120-hour requirement] or lack thereof would have been up to the [T]rustees." June 25, 2013 Transcript at 40.

### E. The 2011 Audit

Cheiron became the pension plan actuary in or around 2006. At some point in 2011, the Trustees engaged Cheiron to conduct an audit of the pension plan. While conducting that audit, Cheiron discovered that Plaintiffs did not meet the 120-hour requirement. Cheiron contacted plan counsel seeking advice. Plan counsel advised Defendants that Plaintiffs were required to work at least 120 hours of service in covered employment under the Local 51 pension plan to qualify for a benefit under the plan. Counsel concluded that if Plaintiffs had not worked at least 120 hours after September 1, 1998, their benefits would have to be recalculated in accordance with the applicable pre-merger pension plan document. Based on the Cheiron audit, Defendants

forwarded the April 2012 letter to Plaintiffs.

### F.  The Local 51 Pension Plan Documents

The Local 51 pension plan is governed by a plan document and a SPD.  As noted, the plan document was not formally adopted by the Trustees until October 12, 1999, but it was made effective retroactively to September 1, 1998.  The plan document provides, in pertinent part, that an

> Employee engaged in Covered Employment during the Contribution Period shall become a Participant in the Plan on the earliest May 1 or November 1 following completion of a period of no more than 12 consecutive months during which he completed at least 120 Hours of Service in Covered Employment.  If on the first anniversary date of his employment an Employee has not completed at least 120 hours of Service in Covered Employment, he will become a Participant at the end of the Plan Year which includes the earliest anniversary of the employee's commencement date if he has completed at least 120 Hours of Service in Covered Employment.  The required hours shall also be completed with any hours of service in other employment with the same Employer if that other employment is contiguous with the Employee's Covered Employment.  An Employee who is credited with 120 Hours of Service in both the initial 12 consecutive month period and the first Plan Year which commences prior to the first anniversary date of the Employee's employment must be credited with two years of service for purposes of eligibility to participate.

Exhibit 10 at § 2.02.  "Plan Year" means the "twelve-month period from May 1 to the next following April 30; however, the first Plan Year shall mean the eight-month period September 1, 1998 to April 30, 1999."  Id. at § 1.20.

The SPD "describes the plan of benefits in effect on September 1, 1998."  Exhibit 11, cover letter (emphasis in original) (capitals omitted).  The SPD provides that if a Local 51 member "left covered employment prior to September 1, 1998, [the member] will be subject to the plan in which [the member] participated as in effect when [the member] last earned credit."  Id. (emphasis in original) (capitals omitted).  The SPD was not forwarded to Plaintiffs until

September 1999.

### III.  Standard of Review

If the "benefit plan gives discretionary authority to the administrator or fiduciary to determine eligibility for benefits[,]" the court applies a deferential arbitrary and capricious or abuse of discretion standard.  Gross v. Sun Life Assurance Co. of Canada, ___ F.3d ___, ___, 2013 WL 4305006, at *8 (1st Cir. August 16, 2013).

> The formal plan document provides that the
>
> Trustees shall have the exclusive right and discretionary authority to construe the terms of the Plan, to resolve any ambiguities, and to determine any questions which may arise with the Plan's application or administration, including but not limited to determination of eligibility for benefits.

Exhibit 10 at § 6.03.   The plan document clearly gives the Trustees discretionary authority to determine eligibility; thus the Court applies the arbitrary and capricious standard.  See Gross, 2013 WL 4305006.  The standard is "generous" but it is not a "rubber stamp."  Wallace v. Johnson & Johnson, 585 F.3d 11, 15 (1st Cir. 2009).  Defendants' decision must be "reasoned and supported by substantial evidence."  Medina v. Metropolitan Life Insurance Co., 588 F.3d 41, 45 (1st Cir. 2009).  "Evidence is substantial if it is reasonably sufficient to support a conclusion. . . ."  Stamp v. Metropolitan Life Insurance Co., 531 F.3d 84, 87 (1st Cir. 2008) (internal quotation marks and citation omitted).  The Court will uphold Defendants' decision "if there is any reasonable basis for it."  Madina, 588 F.3d at 146 (internal quotation marks and citation omitted).

IV.  Analysis[7]

A.  Plaintiffs Retiring Before the Formal Plan Document was Adopted

The Court first addresses Count I of the complaint, Plaintiffs' action for plan benefits under ERISA § 502(a)(1)(B), as it relates to those Plaintiffs who submitted their applications for retirement before the plan document was formally adopted and the SPD was distributed.  Section 502(a)(1)(B) provides that a plan participant may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits.  29 U.S.C. § 1132(a)(1)(b).  "Available relief [under § 502(a)(1)(B)] includes accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrators' improper refusal to pay benefits."  Rosario v. Syntex (F.P.), Inc., 842 F. Supp. 2d 441, 445 (D.P.R. 2012) (internal quotation marks and citation omitted).

Plaintiffs contend that because the 120-hour requirement was not adopted until October 1999, approximately one year after they retired, it cannot be applied retroactively to divest them of their pension benefit.  Defendants argue that the October 1999 Local 51 formal pension plan document is the sole document that should be interpreted in this matter.  Defendants contend that the plan document requires that, in order to be eligible for a benefit under the plan, an individual must have worked at least 120 hours in covered employment after September 1, 1998.  Because Plaintiffs did not work the required 120 hours in covered employment after September 1, 1998,

---

[7]Because the group of Plaintiffs include two significantly distinct groups, the Court separates its analysis into two sections: a section specific to Plaintiffs who retired *before* the formal adoption of the pension plan document and distribution of the SPD; and a section specific to the one Plaintiff, Whittaker, who retired after the pension plan document was formally adopted and the SPD distributed.

14

Defendants conclude that Plaintiffs are not eligible for a pension under the Local 51 plan.[8]  Thus,

Defendants argue that Plaintiffs' benefits must be reduced to their pre-merger levels.

At the time Plaintiffs retired, the Trustees had not yet formally adopted the Local 51 plan

document.  The Trustees, however, were granting retirement benefits under the Local 51 pension

plan.  During this time period, the Trustees were in the process of drafting a plan document.

Until it was formally adopted, however, the plan document was a "work in progress."  June 25,

2013 Transcript at 37.  Thus, even though it took well over a year for the Trustees to finalize the

plan document, in the interim, the Trustees were providing benefits to participants retiring under

the Local 51 pension plan.

"A plan need not be in writing to be covered by ERISA so long as the plan is a reality,

meaning something more than a mere decision to extend benefits."  O'Leary v. Provident Life

and Accident Insurance Co., 456 F. Supp. 2d 285, 293-94 (D. Mass. 2006) (internal quotation

marks and citation omitted); see generally Wickman v. Northwestern National Insurance Co.,

908 F.2d 1077 (1st Cir. 1990); Donovan v. Dillingham, 688 F.2d 1367 (11th Cir. 1982); see also

New England Mutual Life Insurance, Co., Inc. v. Baig, 166 F.3d 1, 5 n.6 (1st Cir. 1999) (failure

to produce documentation should not allow circumvention of ERISA).  Whether an ERISA plan

exists is determined on a case-by-case basis.  Belanger v. Wyman-Gordon Co., 71 F.3d 451 (1st

Cir. 1995); see also Woods v. Berry, Fowles & Co., No. Civ. 01-CV-37-B-C, 2001 WL 1602055

(D. Me. Dec. 14, 2001).

"[A] plan, fund or program under ERISA is established [pursuant to a writing or not] if

---

[8]Martin, Waldron, O'Shea and Whittaker testified that they did not work 120 hours after September 1, 1998.  Defendants admit that Jervis worked 112 hours after September 1, 1998.

from the surrounding circumstances a reasonable person can ascertain the intended benefits, a

class of beneficiaries, the source of financing, and procedures for receiving benefits." Wickman,

908 F.2d at 1082 (quoting Donovan, 688 F.2d at 1373). "ERISA does not mandate intricacy but

only the satisfaction of these criteria." Robbins v. Friedman Agency Inc., 760 F. Supp. 2d 564,

569 (E.D. Va. 2010). No single act in itself constitutes the establishment of a plan. De Jesus v.

Wyeth Pharmaceuticals Co., Civil No. 09-1353 (ADC), 2009 WL 3048415 (D.P.R. Sept. 16,

2009). A "very important consideration" in determining if a plan exists is "whether, in light of

all the surrounding facts and circumstances, a reasonable employee would perceive an ongoing

commitment by the employer to provide employee benefits." Belanger, 71 F.3d at 455; see also

Wickman, 908 F.2d 1083 ("crucial factor" is whether the "proffering of an employee benefit

constituted an expressed intention by the employer[] to provide benefits on a regular and long

term basis"). Additional factors courts consider in determining whether an ERISA plan exists

include an employer's representations in internally distributed documents, an employer's oral

representations, the actual payment of benefits, the reasonable understanding of employees, and

the employer's intent. Moorman v. UnumProvident Corp, 464 F.3d 1260 (11th Cir. 2006).

"So long as they do not modify the terms of a written plan, oral representations by a

knowledgeable and authorized management employee of the company may be evidence of a

benefit plan . . . ." Henglein v. Informal Plan for Plan Shutdown Benefits for Salaried

Employees, 974 F.2d 391, 400 (3d Cir. 1992) (emphasis added); see also Center v. First

International Life Insurance Co., Civil Action No. 94-11596-PBS, 1997 WL 136473, at *6 (D.

Mass. March 13, 1997) (noting that the "surrounding circumstances . . . could include oral

statements"). Where

16

> oral remarks give evidence of a separate plan <u>not precluded by a [valid] written</u>
> <u>plan</u>, the district court may credit the representations as evidence of a plan. . . . .
> To do otherwise would create a loophole inconsistent with ERISA by allowing a
> plan sponsor to make any promise regarding benefits without obligation, so long
> as the promise is not reduced to writing.

<u>Henglein</u>, 974 F.2d at 401; <u>see</u> <u>generally</u> <u>Brines v. XTRA Corp.</u>, 304 F.3d 699 (7th Cir. 2002) (it

is conceivable that an oral plan (or better termed an informal plan) would be enforceable under

ERISA so long as it did not contradict a written plan); <u>Franklin v. Pitney Bowes, Inc.</u>, 919 F.2d

45 (6th Cir. 1990) (court assumed without deciding that unwritten severance policy could

constitute an ERISA plan).  "Because ERISA is a remedial statute, [the Court] construe[s] it

liberally to effectuate its purpose to protect employee benefit fund participants."  <u>Toledo v.</u>

<u>Ayerst-Wyeth Pharmaceutical, Inc.</u>, 852 F. Supp. 91, 98 (D.P.R. 1993).

The parties do not dispute that there was an ERISA pension plan in effect on or about

September 1, 1998.  <u>See</u> <u>generally</u> <u>Wickman</u>, 908 F.2d 1077.  In fact, Defendants readily admit

that it is "clear that the eligibility rules and terms were in place long before" the plan document

was adopted in October 1999.  Defendants' Post-Trial Brief and Memorandum at 28; Docket

#37.  Because there was no formal written plan document in effect, however, the critical inquiry

is whether a reasonable person, in or about September 1, 1998, would ascertain from the

surrounding facts and circumstances, that an individual would have to work 120 hours *after*

September 1, 1998,  in order to be eligible for a retirement benefit under the Local 51 pension

plan.  <u>See</u> <u>generally</u> <u>Wickman</u>, 908 F.2d 1077.

In order to determine whether a reasonable person, in or around September 1, 1998,

would ascertain that the Local 51 pension plan required a participant to work 120 hours after

September 1, 1998, the Court looks to the pertinent surrounding circumstances at or near the time

Plaintiffs retired:

- There was no formally adopted written plan in effect;

- There were several iterations of the draft plan document; it was a work in progress;

- Plaintiffs each received a copy of a letter, from Austin to either Turner or McKeown, informing Plaintiffs that they were eligible to retire and to choose from one of six benefit payment options, see generally Moorman, 464 F.3d 1260 (representation in internally distributed document);

- The Trustees did not apply the 120-hour requirement to Plaintiffs, see generally id., (representation of Trustees' intent);

- The Trustees approved Plaintiffs' retirement benefits, see generally id., (representation of Trustees' intent);

- The Pension Fund paid Plaintiffs' retirement benefits, see generally id., (the actual payment of benefits);

- Plaintiffs were not informed of the 120-hour requirement before they retired, see generally id., (reasonable understanding of employees);

- McKeown informed Jervis of the retirement benefits under the Local 51 pension plan; see generally Henglein, 974 F.2d 391 (oral representations); Center, 1997 WL 136473 (same);

- Aurecchia informed Martin that Martin would be better off waiting to retire until after September 1, because Martin's pension would be higher under the Local 51 pension plan, see generally Moorman, 464 F.3d 1260 (Trustees' intent);

- On or about June 7, 1999, Austin informed McKeown that Jervis did not work after September 1, 1998; yet, one month later, McKeown forwarded Austin's letter to Jervis informing Jervis that Jervis could select one of six benefit payment options; the Trustees approved his retirement benefit, see generally Moorman, 464 F.3d 1260 (representation in internally distributed documents; intent of Trustees and Administrator);

- Based on information that he received from union officers, prior to September 1, 1998, Martin estimated what his benefit would be under the Local 51 pension plan and his estimate was approximately the benefit he received under the plan, see generally Henglein, 974 F.2d 391 (oral representations); Center, 1997 WL 136473 (same);

18

- Aurecchia informed Waldron that he was eligible to retire under the Local 51 pension plan, see generally id.;

- Before Segal started to draft the plan document, Segal presented the Trustees with an outline of the pension plan;

- Even though there was no formal written plan document in effect in 1998, the Trustees approved the payment of benefits based on Segal's outline, information from the Pension Fund office, and the benefit calculations performed by Austin;

- Austin attended some Trustee meetings and communicated with the Pension Fund office;

- When Austin performed Plaintiffs' benefit calculations he based his calculation on information he received from the Pension Fund office, the draft plan document in effect at the time, and his understanding of the wishes of the Trustees, see generally Moorman, 464 F.3d 1260 (Trustees' intent);

- Austin would forward the benefit calculations to Turner and the Trustees would approve eligibility, benefit calculations, and benefit payments, see generally id.;

- The 1/10 Pension Credit provision *first* appeared in the August 31 red lined draft copy of the plan document; the provision was not in the prior draft;

- Austin did not apply the 1/10 Pension Credit provision to Plaintiffs' calculations and the provision does not appear in the formal plan document adopted in October 1999;

- If Austin had been aware of the 120-hour requirement when he performed a benefit calculation it would have been his practice to make a notation on the benefit calculation for the Trustees to review; no such notations were made;

- With respect to the June 7, 1999, letter wherein Austin informed McKeown that Jervis did not earn pension credit after September 1, 1998, Austin stated that he was simply pointing out that Jervis did not earn any credit after the merger date; the Trustees, however, did not apply the 120-hour requirement to Jervis, see generally id.

Based on the overwhelming evidence, both written and oral, the Court concludes that at

the time Plaintiffs retired, the Local 51 pension plan was an informal pension plan under ERISA

which did *not* include the requirement that Plaintiffs had to work 120 hours *after* September 1,

19

1998, in order to be eligible for a benefit under the pension plan.

The central mission of ERISA is to protect "employees' justified expectations of receiving the benefits their employers promise them." Tasker v. DHL Retirement Savings Plan, 621 F.3d 34, 39 (1st Cir. 2010) (internal quotation marks and citation omitted).  ERISA's anti-cutback rule plays a critical role in ERISA's central mission.  Thorton v. Graphic Communications Conference of The International Brotherhood of Teamsters Supplemental Retirement and Disability Fund, 566 F.3d 597 (6th Cir. 2009).  The anti-cutback rule provides, with certain exceptions not relevant here, that the "accrued benefit of a participant under a plan may not be decreased by an amendment to the plan. . . ."  29 U.S.C. § 1054(g)(1); see also Contilli v. Local 705 International Brotherhood of Teamsters Pension Fund, 559 F.3d 720, 723 (7th Cir. 2009) (the anti-cutback rule "provides that, once a participant's right to a benefit has vested, the terms of a pension plan cannot be changed to reduce the amount of that benefit"); Green v. Holland, 480 F.3d 1216, 1228 (11th Cir. 2007) (the anti-cutback rule is "intended to prevent employers from pulling the rug out from under employees participating in a plan . . . by preventing employers from eliminating benefits via a Plan amendment") (internal quotation marks and citation omitted).[9]  ERISA defines an accrued benefit as, generally, "the individual's accrued benefit determined under the plan . . . expressed in the form of an annual benefit commencing at normal retirement age."  Toomey v. Jones, 855 F. Supp. 19, 26 (D. Mass. 1994); 29 U.S.C. § 1002(23)(A).

In this case, Defendants engaged Cheiron to conduct a plan audit.  Based upon the 120-

---

[9]The Local 51 formal pension plan document provides that "no amendment may decrease the accrued benefit of any Participant . . . ."  Exhibit 10 at § 9.01.

hour requirement language contained in the written plan document, Cheiron reported that

Plaintiffs were *not* eligible to receive the benefits that they had been told they were entitled to

when they retired.  Defendants adopted Cheiron's conclusion.  Neither Cheiron or Defendants,

however, took into consideration what the plan requirements were *at the time* Plaintiffs retired.

As this Court has determined, the Local 51 plan was, in or about late summer and fall of 1998, a

"work in progress."  The actuary and the Trustees found Plaintiffs eligible based on the

documents and practices in place in 1998.  Defendants' reliance now on a plan document that

was not formally adopted until one year *after* Plaintiffs retired and began receiving their benefits,

calculated and approved by the Trustees, violates ERISA's anti-cutback provision.  See Swede v.

Rochester Carpenter's Pension Fund, No. 04-CV-6591T, 2005 WL 5336573, at *1 (W.D.N.Y.

December 15, 2005), aff'd, 467 F.3d 216 (2d Cir. 2006) (noting that ERISA's anti-cutback

provision embodies the "common sense notion . . . that you can't change the rules after a person

has retired to deprive that person of benefits . . . earned"); see generally Carney v. International

Brotherhood of Electrical Workers, CIV. A. 00-6270, 2002 WL 1060652 (E.D. Pa. May 23,

2002), aff'd, 66 F. App'x 381 (3d Cir. 2003) (by retroactively applying a plan amendment to

plaintiff the Trustees changed eligibility requirements and violated ERISA).  As such,

Defendants' decision to reduce Plaintiffs' monthly benefits cannot survive judicial scrutiny, even

under the deferential "arbitrary and capricious" standard.

### B.  Plaintiff Who Retired After the Formal Plan Document was Adopted

Whittaker submitted his application for retirement on November 3, 1999, some three

weeks *after* the plan document was adopted.  McKeown forwarded Austin's benefit calculations

to Whittaker in December 1999; Whittaker testified that he retired in December 1999.  Although

Whittaker testified that he could not remember if he received a copy of the SPD before he retired,

Martin testified that he received the SPD from McKeown in September 1999.  Thus, when

Whittaker retired, the Trustees had formally adopted the plan document and the Fund Office had

distributed the SPD.  Plaintiffs' primary argument, that Defendants retroactively applied the 120-

hour requirement, therefore, does not apply to Whittaker.  Because the Court's decision on the

retroactive application of the 120-hour requirement does not apply to Whittaker, the Court

addresses Plaintiffs' remaining arguments only as they apply to Whittaker.

### 1.  The Eligibility Requirements of the Formal Plan Document

Although making no specific argument as to Whittaker, Plaintiffs contend that all

Plaintiffs are entitled to plan benefits because they met the eligibility requirements of the formal

plan document.  Plaintiffs contend that hours worked subsequent to September 1, 1997,

constitute hours of service for covered employment under the formal plan document.  Defendants

contend that an individual must have worked 120 hours after September 1, 1998, in order to be

eligible for a benefit under the formal plan document.[10]  Whittaker did not work 120 hours after

September 1, 1998.

> The formal pension plan document provides that an
>
> Employee engaged in Covered Employment during the Contribution Period shall
> become a Participant in the Plan on the earliest May 1 or November 1 following
> completion of a period of no more than 12 consecutive months during which he
> completed at least 120 hours of Service in Covered Employment.

Exhibit 10 at § 2.02.  "Covered Employment" is defined as "employment by an Employee at an

---

[10]As noted, when a plan gives a fiduciary the discretionary authority to determine eligibility for benefits or
to construe the terms of the plan, as is the case here, the standard of review for Defendants' interpretation of plan
language is deferential.  Hannington v. Sun Life and Health Insurance Co., 711 F.3d 226 (1st Cir. 2013).

employment for which such Employer has agreed to contribute to the Fund under a collective

bargaining agreement with the Union. . . ." Id. at § 1.09.  "Contribution Period" is the "period

for which the Employer agrees to make such contributions as are required by an Agreement on

behalf of employees performing work of a nature covered by that Agreement." Id. at § 1.07.

The plan year is the "twelve-month period from May 1 to the next following April 30; however,

the First Plan Year shall mean the eight-month period September 1, 1998 to April 30, 1999." Id.

at § 1.20 (emphasis added.)

Plaintiffs ignore the date that the formal pension plan was established.  The formal

pension plan, when adopted in October 1999, became effective as of September 1, 1998.  The

first plan year was the eight-month period from September 1, 1998, to April 30, 1999.  Section

2.02 of the formal plan document provides that an employee will become a participant in the

plan, which was effective September 1, 1998, *following* the completion of a period of no more

than 12 months during which the employee completed at least 120 hours of service in covered

employment.  The formal plan's starting point was the beginning of the first plan year, that is,

September 1, 1998.  Section 2.02 must be read in light of that starting point.  Thus, in order to be

eligible for a benefit, an individual must have worked 120 hours after the starting point,

September 1, 1998.  The Court finds that Defendants' interpretation of the written plan document

is not arbitrary or capricious.

Furthermore, the SPD is consistent with this interpretation.  The SPD provides that "[t]o

become a Participant in the Plan, you must complete at least 120 Hours of Service during a

period of no more than 12 consecutive months.  You will become a Participant on the following

May 1 or November 1, whichever comes first."  Exhibit 11 at 5.  The cover letter with the SPD

also informed Local 51 members that the SPD summarized "<u>the plan of benefits in effect on</u>

<u>September 1, 1998.  If you left covered employment prior to September 1, 1998, you will be</u>

<u>subject to the plan in which you participated as in effect when you last earned credit</u>."   <u>Id.</u> at

cover letter (emphasis in original) (capitals omitted).

The SPD clearly outlines the 120-hour requirement and provides that if an individual left

covered employment prior to September 1, 1998, the individual would be subject to the

applicable pre-merger pension plan.  This supports the conclusion that in order to be eligible for a

benefit under the formal pension plan document, the participant had to work 120 hours after

September 1, 1998.  Whittaker testified that he left covered employment in June of 1998.  The

Court finds that Whittaker does not meet the eligibility requirements of the formal plan

document.

## 2.  Other Claims

Plaintiffs contend that they are entitled to "appropriate equitable relief[,]" pursuant to 29

U.S.C. § 1132(a)(3).[11]  Plaintiffs argue that the Trustees breached their fiduciary duties by failing

to inform Plaintiffs that they were not participants within the meaning of the pension plan.  In the

alternative, Plaintiffs also argue that even if the Trustees did not breach their fiduciary duties,

Defendants should be estopped from reducing Plaintiffs' pension benefits.  Once again, however,

Plaintiffs fail to make any arguments specific to Whittaker.  Instead, Plaintiffs present

generalized arguments on behalf of all Plaintiffs.  Whittaker's situation is markedly different

from the other Plaintiffs and places him in a different legal posture.  Whittaker retired after the

---

[11]For the purposes of this decision, the Court assumes without deciding that Whittaker's claims would qualify as appropriate equitable relief under the scope of 29 U.S.C. § 1132(a)(3).

formal plan document was adopted and after the SPD was distributed.  Thus, Whittaker received notification of the 120-hour requirement and cannot show the detrimental reliance that is essential to his claims.  The Court finds that Whittaker's breach of fiduciary duty and estoppel claims fail.

### V.  Plaintiffs' Request for Costs, Expenses, and Attorneys' Fees

Plaintiffs request costs, expenses and attorneys' fees pursuant to 29 U.S.C. § 1132(g).  Plaintiffs are ordered to file a detailed brief supporting their request (with time records) on or before October 31, 2013.  Defendants will have until November 14, 2013 to respond.

### VI. Conclusion

In summary, the Court finds that Plaintiffs Jervis, Martin, Waldron, and O'Shea are entitled to their unreduced pension benefits pursuant to 29 U.S.C. § 1132(a)(1)(b).[12]

SO ORDERED

/s/ Mary M. Lisi
Mary M. Lisi
Chief United States District Judge
October 17, 2013.

---

[12]Plaintiffs also allege that Defendants have violated 29 U.S.C. § 1024 as a result of Defendants' alleged failure to produce requested documents.  Plaintiffs, however, have failed to brief this issue, thus Plaintiffs have waived the claims.  United States v. Zannino, 895 F.2d 1 (1st Cir. 1990).
Because the Court has determined that Plaintiffs Jervis, Martin, Waldron, and O'Shea are entitled to their unreduced pension benefits pursuant to Count I, the Court need not address the remaining counts in the complaint as to these Plaintiffs.